UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

David McGee, Jacob Sexton,
Richard Pahl, Jose Torres, Kevin
Kimber, Daniel Muir, James
Anderson, and all other
inmates similarly situated,

       Plaintiffs,

      v.                                                Civil Action No. 1:04-CV-335

Steven Gold, Robert Hofmann,
Keith Tallon, Celeste Girrell, John
Gorczyk, Kathleen Lanman,
Michael O'Malley, Anita Carbonnel,
Stuart Gladding, Daniel Florentine,
Raymond Flum, and Carol Callea,

       Defendants.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 238 and 251)

      This is a civil action brought by a class of Vermont inmates pursuant to 42 U.S.C.

§ 1983.  The plaintiffs claim that constant illumination of their prison cells has caused

harm to their physical and mental health in violation of their rights under the Eighth

Amendment to the United States Constitution, and Chapter 1, Article 18 of the Vermont

Constitution.  The defendants now move for summary judgment, arguing that the 24-hour

security lighting used in prison cells is no brighter than "a standard night light," and that

the plaintiffs have failed to show either harm as a result of such lighting, or deliberate

indifference by correctional personnel.  The defendants also submit that legitimate

penological interests justify the use of low-level 24-hour security lighting.

For the reasons set forth below, I recommend that the defendants' motions for summary judgment be GRANTED, and that this case be DISMISSED.

## Factual Background

The plaintiffs claim that 24-hour lighting in Vermont prison cells has been detrimental to their health.  They allege that in addition to the loss of sleep, constant lighting in their cells has caused them to suffer symptoms such as headaches, mental fatigue, and cold and flu-like symptoms.  They also allege that exposure to constant illumination has exacerbated their existing medical and mental health conditions, including various psychiatric disorders.

The Vermont Department of Corrections ("DOC") does not dispute that it uses 24-hour lighting in some of its prisons.   The DOC operates nine facilities in Vermont, six of which use 24-hour lighting in some portion of the prison.  The wattage of the lights used includes 5 watt compact fluorescent bulbs, 7-8 watt fluorescent bulbs, and 10 watt incandescent bulbs.

Pending before the Court is the defendants' motion for summary judgment.  In support of their motion, they have submitted a series of affidavits, including a statement from DOC Facilities Executive Robert Kupec.  Kupec attests in his affidavit that given the wattage of the bulbs being used, "the average amount of light in a cell with twenty four hour lighting does not exceed what one would expect from a standard night light." (Doc. 239-1 at 2.)  He also explains that correctional officers check prison cells regularly during the night, that such checks are necessary, and that low-level 24-hour lighting allows for these checks to be performed thoroughly and efficiently:

> As a routine matter, correctional officers perform visual safety checks on all inmates multiple times per night.  These visual checks are essential to preventing inmate suicide, and inmate-on-inmate abuse.  In addition, the safety checks are meant to prevent other behavior that poses security risks, such as escape attempts.
> . . .
>
> Critical elements of a safety check require that the officer verify the presence and identity of the correct inmates in the correct cells, that the inmates in the cell are alive, and that the cell walls and windows are intact.
> . . .
>
> Twenty four hour security lighting enables an officer to see all parts of a cell's interior at once.  This enhances an officer's ability to quickly and accurately verify that inmates are safe and not engaging in prohibited activities.

*Id.* at 2-3.  Kupec further contends that constant lighting in cells is preferable to the use of flashlights, since flashlights: do not allow correctional officers to view the entire cell at once; increase the likelihood that an officer will need to enter a cell to perform an adequate check, thereby putting the officer at additional risk; alert inmates that an officer is coming; and disrupt inmate sleep when pointed directly at the inmate's face in order to confirm identity.  *Id.* at 3-4.

Kupec avers that in his role as Facilities Manager, he would be made aware of conditions that might cause significant health problems.  Outside of this litigation, he is not aware of any such complaints with respect to 24-hour security lighting.  He also reports that accommodations may be made "to minimize any perceived health effects . . . such as sleep disturbances or headaches," but that he has not received requests for such accommodations outside the context of this litigation.  *Id.* at 4.  Accommodations would be crafted in consultation with the DOC's Director of Medical Services.  *Id.*

3

The plaintiffs have submitted affidavits challenging Kupec's characterization of the lighting as no brighter than a "night light."  One inmate, Stacey Colson, asserts that the "[t]he light at night is much brighter than a nightlight," and that he can read by the light even when lying on a bottom bunk.  (Doc. 266-4 at 2-3.)  Inmate Michael Myers corroborates Colson's statement that the lighting is bright enough for reading.  (Doc. 266-5 at 1.)  Both inmates state that they generally do not sleep more than 5 hours per night, and that the lack of sleep is detrimental to their pre-existing depression.

The plaintiffs have also filed an affidavit from Dr. Philip Burke, a board-certified psychiatrist.  Dr. Burke has reviewed the Colson and Myers affidavits, and confirms that their experiences of increased depression are consistent with research on the impact of sleep deprivation on depressive illness.  (Doc. 266-3 at 1.)  Dr. Burke concedes that, in general, "it is virtually impossible to demonstrate with a high level of evidence (i.e. a controlled study) that a causal relationship exists between an exposure and a certain disease in human beings."  *Id.* (parenthesis in original).  Nonetheless, he concludes that based upon studies demonstrating "a significant correlation between chronic sleep deprivation and various diseases such as depressive illness," housing inmates in constant illumination, and assuming that such illumination causes sleep deprivation, "places the inmates at increased risk for depressive illness" and other medical conditions such as high blood pressure and diabetes.  *Id.* at 2.

The plaintiffs' second expert is Walter Kautzky, a former Director of the Iowa Department of Corrections and a veteran of other corrections departments around the country.  (Doc. 266 at 1-2.)  Kautzky testifies that, in his experience, fluorescent bulbs

between 3 and 8 watts are adequate for security purposes.  *Id.* at 2-5.   Kautzky does not make any statements about Vermont facilities specifically.

The final affidavit before the Court is that of DOC Medical Director Delores Burroughs-Biron, M.D.  Dr. Burroughs-Biron has reviewed the medical charts of several plaintiffs in this case (David McGee, Jacob Sexton, Richard Pahl, James Anderson and Kevin Kimber), and concludes that "[e]ach of these inmates has one or more conditions that produce symptoms that are virtually indistinguishable from the symptoms that might develop due to exposure to twenty four hour security lighting, such as migraine headaches, difficulties sleeping, anxiety and depression."  (Doc. 239-2 at 2.)  She also states that their medical charts reveal "no discernable onset, or clear exacerbation of, symptoms that might be directly caused by twenty four hour security lighting," and that while inmates have complained of health problems resulting from the lighting, their "documented behavior at or around the time the complaints were made seemed inconsistent, medically, with the expected behavior of an individual making these complaints."  *Id.*

Dr. Burroughs-Biron further reports that, like Kupec, she would be informed through grievances or direct communications if the prison population generally had been complaining about 24-hour lighting.   Outside of this litigation, she has "not been made aware of a pattern of any such complaints by inmates in the general population or special housing units," and has "not been made aware of any individual inmate who has complained of symptoms that would indicate twenty four hour security lighting is detrimentally affecting that inmate . . . ."  *Id.* at 8.

**Procedural History**

This case began in December of 2004, when plaintiff David McGee filed a *pro se* complaint.  McGee's filing was followed by a series of standard-form motions to intervene from over 50 inmates, each claiming injuries as a result of constant illumination in their prison cells.  The case was subsequently consolidated with a similar action brought by plaintiff Jacob Sexton, was ultimately certified as a class action, and the Court has made funds available to the plaintiff class for the retention of experts.

Representing the class is the Office of the Vermont Defender General, Prisoners' Rights Office.  Because the Prisoners' Rights Office is not authorized to pursue claims for damages, it has filed an amended complaint seeking only declaratory and injunctive relief.  The Court has determined previously that damages claims brought by the *pro se* plaintiffs (McGee and Sexton) cannot be prejudiced by the appointment of class counsel, and that those claims thus survive.  For purposes of liability, however, the Court deems the issues to be the same regardless of the form of relief being sought.

**Discussion**

**I.      Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party.  *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970).  If the moving party meets its burden, the non-moving party must then set forth "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 322-23.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.  At summary judgment, the Court draws all factual inferences in favor of the non-moving party.  *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005).

## II.   Eighth Amendment Claim

The plaintiffs claim that the constant illumination of their cells violates their rights under the Eighth Amendment.  The Eighth Amendment prohibits cruel and unusual punishment, and applies to the states through the Due Process Clause of the Fourteenth Amendment.  U.S. Const. amend. VIII; *Robinson v. California*, 370 U.S. 660, 666 (1962).  Thus, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being."  *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

In order to prevail on an Eighth Amendment claim, a plaintiff must satisfy both objective and subjective components.  First, the deprivation must be objectively serious such that the prison official's act or omission resulted "in the denial of 'the minimal civilized measure of life's necessities.'"  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Second, a prison official must have a "sufficiently culpable state of mind."  *Id.*  Under this latter component, the official

will not be held liable for inhumane conditions "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

### A.    Objectively Serious

The defendants first argue that the plaintiffs have failed to show an objectively serious condition of confinement.  The Supreme Court has held that "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  As the Second Circuit explains, "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient . . ." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999); *see also Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) ("The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones.")..

In this case, the condition of confinement being challenged is low-level 24-hour security lighting.  Constant illumination of a prison cell, standing alone, has generally been upheld as constitutional. *See, e.g., Warren v. Kolender*, 2009 WL 196114, at *15 (S.D. Cal., Jan. 22, 2009); *Pozo v. Hompe,* 2003 WL 23185882, at *10 (W.D. Wis. Apr. 8, 2003).  However, 24-hour lighting of prison cells with excessively bright bulbs has been held to violate the Eighth Amendment. *See Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996).  As the plaintiffs note in their opposition memorandum, the inquiry with respect to whether constant security lighting in prison cells violates the Eighth

Amendment is necessarily fact-specific.  (Doc. 264 at 5); *see Shepherd v. Ault*, 982 F. Supp. 643, 645 (N.D. Iowa 1997).

### i. Brightness

The evidence in this case is mixed as to the subjective intensity of the security lighting being used in Vermont prisons.  Myers and Colson contend that the lights are bright enough for reading.  The DOC's Kupec concedes that the lights may be sufficient for reading, but not without straining.  (Doc. 239-1 at 2.)  For purposes of summary judgment, the Court must accept the inmates' representations that the lighting is sufficient for reading, and is brighter than a standard night light.

The only objective measure of intensity currently before the Court is the wattage of the lighting being used.  The record indicates that Vermont prisons are using compact fluorescent lighting between 5 and 8 watts, fluorescent bulbs between 7 and 8 watts, and 10-watt incandescent bulbs.[1]  These intensities are in a range that courts have generally found permissible under the Constitution.  *See Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. Aug. 15, 2008) (24-hour lighting involving a single, 9-watt fluorescent bulb does not objectively constitute an "extreme deprivation."); *McBride v. Frank*, 2009 WL 2591618, at *5 (E.D. Wis. Aug. 21, 2009) (constant illumination from a 9-watt fluorescent bulb does not objectively deny "the minimal civilized measure of life's necessities."); *Wills v. Terhune*, 404 F. Supp. 2d 1226, 1230-31 (E.D. Cal. 2005) (holding that 24-hour illumination by 13-watt bulb was not objectively unconstitutional); *Pawelski*

---

[1]  In *Walker v. Woodford*, 593 F. Supp. 2d 1140, 1150 -51 (S.D. Cal. 2008), an expert testified that light from a 7-watt compact fluorescent bulb was "about 1 lux . . . roughly equivalent to full darkness with a full moon on a clear night").

*v. Cooke*, 1991 WL 403181, at *4 (W.D. Wis. July 18, 1991) ("Having a single 40 watt light bulb on 24 hours a day for security purposes amounts to no more than an inconvenience to the segregation inmates."), *aff'd*, 972 F.2d 352 (7th Cir. 1992) (table opinion); *compare Keenan*, 83 F.3d at 1090-91 (lighting from "large fluorescent lights" was unconstitutional where plaintiff alleged that he "had no way of telling night or day"); *Shepherd*, 982 F. Supp. at 646-50 (summary judgment denied where inmates claimed harm from 60-watt bulbs).

### ii.    Causation

Courts have also rejected constitutional challenges to 24-hour lighting where evidence of causation was lacking.  *See Murray v. Edward's County Sheriff's Dep't*, 248 F. App'x 993, 998-99 (10th Cir. 2007) (upholding summary judgment for jail officials on ground that detainee had failed to establish that sleep problems from continuous cell illumination were sufficiently severe to trigger Eighth Amendment), *cert. denied*, 128 S. Ct. 2428 (2008); *Brown v. James*, 2009 WL 790124, at *8 (M.D. Pa. March 18, 2009) (no constitutional violation where plaintiff failed to offer evidence that 24-hour lighting caused his headaches); *Willis*, 404 F. Supp. 2d at 1230-31 (lighting did not constitute cruel and unusual punishment in absence of evidence of "grave sleeping problems" or other harm).  In this case, the undisputed evidence, and in particular the unchallenged affidavit of Dr. Burroughs-Biron, undermines the plaintiffs' claims that constant lighting has been harmful to their physical and mental health.

The plaintiffs submit that 24-hour lighting has exacerbated certain medical issues, including headaches and depression.  Dr. Burke's affidavit suggests that, according to

10

research studies, a link between sleep deprivation and increased depression is possible. However, as Dr. Burroughs-Biron's affidavit indicates, the plaintiffs' medical charts give little indication of a connection.  This fact is not disputed.

Dr. Burroughs-Biron explains that David McGee has suffered migraines since he was eight years old, and while incarcerated has not always been compliant with prescribed medications.  His headaches "often coincide with episodes of noncompliance," and symptoms allegedly related to 24-hour lighting are, according to Dr. Burroughs-Biron, "just as easily explained by his sporadic compliance with his prescribed medications and/or the natural course of migraine headaches."  (Doc. 239-2 at 3.)

Jacob Sexton also has a long history of migraines.  While in prison, he has blamed his headaches on a number of causes, including prescription medication and hitting his head on the frame of his bed.  His headaches have also been attributed to the overuse of analgesics.  Finally, Sexton has been observed eating foods to which he is allegedly allergic, and which might exacerbate his migraines.  He has spoken to prison officials about light sensitivity, but Dr. Burroughs-Biron notes that such sensitivity is typically a symptom of migraines, rather than a cause.  *Id.* at 3-6.

Richard Pahl suffered serious injuries, including facial fractures and traumatic brain injury, in a motor vehicle accident several years prior to his incarceration.  Since the accident, he has reported chronic intermittent headaches, many of which originate in his sinuses.  Dr. Burroughs-Biron opines that the sinus issues may be linked to Pahl's facial fractures.  *Id.* at 7.

Pahl also has a "floating" left eye, meaning that his left eye does not move in tandem with his right eye.  Dr. Burroughs-Biron submits that this condition may lead to headaches.  Further, Pahl worked the third shift in the prison laundry for several years.  Dr. Burroughs-Biron attests that "[w]orking third shift is well known to cause disruptions in a person's wake/sleep cycles."  *Id.* at 6.  Given these facts, Dr. Burroughs-Biron concludes that any of Pahl's alleged symptoms arising from 24-hour lighting "are just as adequately explained" by other conditions.  *Id.*

Plaintiff James Anderson's records "contained virtually no complaints about the effects of twenty four hour security lighting."  *Id.* at 7.  Anderson did complain of sleep disturbances as a result of taking, or discontinuing, certain medications.  *Id.*

Plaintiff Kevin Kimber has a history of mental health issues, including bi-polar disorder.  According to Dr. Burroughs-Biron, he also has a history of refusing to take his medications.  "His medical records reveal a correlation between medication use and the destabilization of his condition, including his perception of his environment."  *Id.*  Given Kimber's history, Dr. Burroughs-Biron states that "[t]he combined effects of periodically stopping and starting psychiatric medications with the concomitant exacerbation of psychiatric symptoms and onset of medication side effects makes it virtually impossible to correlate any increase or decrease in psychiatric symptoms with periods of exposure to twenty four hour security lighting."  *Id.* at 8.

Aside from Dr. Burroughs-Biron's opinions, there is little in the record addressing the question of causation.  The plaintiffs have submitted reports of psychiatric evaluations performed by Dr. Jonathan Weker on inmates Colson and Myers, but these

reports do not address the causation question.  (Doc. 266-6.)  In fact, neither report addresses the lighting issue specifically.  In the Colson report, Dr. Weker states that the emergence of depression "is a complex topic, as current knowledge in the field emphasizes the interconnection between biological, psychological and environmental factors."  (Doc. 266-6 at 9.)  The report also notes that Colson's family history "suggests a genetic, biological predisposition to depression."  *Id.*  In Myers' case, Dr. Weker found that Myers, incarcerated since 2008, had been suffering from depression since 1993.  *Id.* at 2-3.  Dr. Weker also noted that Myers has taken Ambien for sleep when not incarcerated, and while in prison has been provided medication that reportedly helps him sleep.  *Id.* at 3.

It is well settled that, in order for a defendant to be held liable under § 1983, the defendant must be the proximate cause of the alleged injury.  *See Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007).  "This entails that a plaintiff must allege facts which, if taken as true, would 'demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct.'"  *Burton v. Lynch*, 664 F. Supp. 2d 349, 361 (S.D.N.Y. 2009) (quoting *Geirlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998)).  With respect to prison lighting claims specifically, "[i]n order to succeed on a claim of illegal illumination, plaintiff must produce evidence that the constant illumination had harmful effects on his health beyond mere discomfort."  *Vasquez v. Frank*, 2007 WL 3254702, at *5 (W.D. Wis. Nov. 2, 2007).

The affidavit of Dr. Burroughs-Biron establishes that there are a number of potential causes for the symptoms being alleged.  The plaintiffs have offered nothing to

rebut her conclusions, instead admitting as undisputed that the medical records she
reviewed reveal "no onset of, or clear exacerbation of, conditions or symptoms that might
be directly caused by twenty four hour security lighting."  (Doc. 239 at 4); (Doc. 265 at
3).  The affidavit of Dr. Burke is general in nature, establishing only that medical
research has shown a link between chronic sleep deprivation and various human illnesses.
(Doc. 266-3 at 2.)  The plaintiffs have not offered any medical diagnosis with respect to
their symptoms, and thus no expert testimony linking constant lighting to the harms
alleged.  Indeed, the only suggestion of a direct connection is the testimony from the
prisoners themselves.

One district recently considered similar evidence, and found that summary
judgment was warranted.

> Defendants have provided a good deal of evidence other factors could have
> interfered with [the plaintiff's] ability to sleep and in turn caused his other
> symptoms.  Plaintiff presents no evidence these other factors were not
> present, but simply assumes they did not cause his insomnia.  His own
> speculation about the cause of his insomnia and other symptoms, however,
> does not suffice to withstand summary judgment.  Summary judgment
> would therefore be appropriate on the issue of causation alone.

*Walker*, 593 F. Supp.2d at 1150 -51 (internal citation omitted); *see also Hampton v.
Ryan*, 288 F. App'x 404, 405 (9th Cir 2008) (upholding district court's granting of
summary judgment where plaintiff "failed to raise a triable issue as to whether the
lighting level in his cell caused him to suffer psychological or physical harm."); *Murray*,
248 F. App'x at 998 (while plaintiff "may have presented evidence of a sufficiently
serious harm with respect to his depression, he failed to show that it was *caused* by the
continuous illumination of his cell") (emphasis in original).  The *Walker* court also noted

that, if the inmate's "medical records contained any such evidence [linking his sleep difficulties and related symptoms to the lighting], he could have submitted them.  In fact, there is no indication such evidence might exist."  593 F. Supp. 2d at 1150.  In light of Dr. Burroughs-Biron's affidavit, and the plaintiffs' admission that the medical records do not support their claims, the same is true here.

Even when considered favorably, the plaintiffs' evidence is speculative and conclusory.  Assuming that the lights are as bright as they claim, the plaintiffs have nonetheless failed to show that constant lighting, and any resulting loss of sleep, has been a cause of their injuries.  Without such a showing, the Court should find that there is no genuine issue of material fact on the question of whether continuous lighting has created a condition of confinement so extreme as to be unconstitutional, and should enter summary judgment for the defendants.  *See Farmer*, 511 U.S. at 834.

### iii.    Future Harm

With respect to any future harm, the parties agree that the analysis is controlled by *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  In *Helling*, the issue was whether an inmate was being subjected to unreasonably high levels of second-hand tobacco smoke.  509 U.S. at 35.  The Court explained that courts must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  *Id.* at 36 (emphasis in original).

For the reasons set forth above with respect to the brightness of the lights and the question of causation, the plaintiffs have failed to meet their burden under *Helling*. Specifically, the plaintiffs have failed to show either that the lighting is unreasonably bright, or that the effects of constant lighting are so extreme as to violate "contemporary standards of decency." *Id.*  At most, the plaintiffs have demonstrated that the lighting may make it difficult for them to sleep, that placing an object such as a blanket or sock over their eyes has proven impractical, and that sleep deprivation may be detrimental to inmate health.  Their evidence does not indicate conditions that are beyond what "today's society chooses to tolerate." *Id.*  The Court should therefore find that the plaintiffs have failed to present a genuine issue of material fact as to an objectively serious condition – past, present, or future – that violates the Eighth Amendment.

### B.    Deliberate Indifference

Even if the plaintiffs could prove an objectively serious condition of confinement, they have failed to show that the defendants acted with deliberate indifference.  Based upon the evidence now before the Court, it is not clear (1) that there were facts to support an inference of a substantial risk of serious harm, or (2) that the defendants drew that inference.  *Farmer*, 511 U.S. at 837.  Because Dr. Burke's affidavit has been submitted strictly in the context of this litigation, the Court assumes that the information available to the defendants prior to summary judgment consisted primarily of the plaintiffs' complaints and medical records.  It is undisputed, however, that those medical records do not support a link between 24-hour lighting and either the onset or exacerbation of any condition or symptom.  (Doc. 239 at 4); (Doc. 265 at 3).

16

Furthermore, accommodations were permitted.  Plaintiffs Jacob Sexton and Stacey Colson state that they were allowed to use objects such as socks or blankets to cover their eyes at night.  Sexton found that the blanket option was not "practical" during the summer months (Doc. 195 at 5), while Colson claims that a sock "invariably falls off." (Doc. 266-4 at 2.)  Nonetheless, at least one court has held that "in the absence of evidence showing [that inmates' covering their eyes was] ineffective, [allowing such an accommodation was] a reasonable response to any risk posed by the constant lighting." *Vasquez*, 2007 WL 3254702, at *6; *see also King v. Frank*, 371 F. Supp. 2d 977, 985 (W.D. Wis. 2005) (inmates allowed to cover eyes with towel, washcloth or t-shirt).  The *Vasquez* court also commented that although the plaintiff claimed that placing towels over his eyes was uncomfortable, "the constitution does not require comfortable conditions . . . ."  2007 WL 3254702, at *6.  Moreover, both Kupec and Dr. Burroughs-Biron make clear that outside of this litigation, they have not received any requests for accommodations to mitigate the effects of 24-hour security lighting.  *Id.*; (Doc. 239-2 at 8.)

The plaintiffs argue that, in the course of the litigation, the defendants have been made aware of the risks of constant illumination and should therefore be ordered to implement changes.  The evidence, however, indicates that the defendants are still not aware of any harm being caused by low-level security lighting.  While the affidavit of Dr. Burke may have now made the defendants aware of the *possibility* of harm, the plaintiffs' medical histories discount any inference that the use of 5 to 10 watt bulbs is actually causing harm.  Just as the Court need only draw "reasonable" inferences against the

moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986), the defendants should not be required to alter their practices based upon

speculation, and the Court should grant summary judgment in their favor.

C.    **Legitimate Penological Interests**

The defendants further argue that 24-hour security lighting is justified by

legitimate penological concerns.  In *Turner v. Safley*, the Supreme Court held that "when

a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it

is reasonably related to legitimate penological interests."  482 U.S. 78, 89 (1987).

> In our view, such a standard is necessary if prison administrators . . . , and
> not the courts, [are] to make the difficult judgments concerning institutional
> operations.  Subjecting the day-to-day judgments of prison officials to an
> inflexible strict scrutiny analysis would seriously hamper their ability to
> anticipate security problems and to adopt innovative solutions to the
> intractable problems of prison administration.  The rule would also distort
> the decisionmaking process, for every administrative judgment would be
> subject to the possibility that some court somewhere would conclude that it
> had a less restrictive way of solving the problem at hand.  Courts inevitably
> would become the primary arbiters of what constitutes the best solution to
> every administrative problem, thereby unnecessarily perpetuating the
> involvement of the federal courts in affairs of prison administration.

*Id.* (internal quotations and citations omitted).  The *Turner* Court also noted that prison

officials are not required to adopt the policy that is the least restrictive on prisoners'

rights, so long as the policy adopted is itself reasonable.  *Id.* at 90.  As the Second Circuit

recently explained, courts "owe substantial deference to the professional judgment of

prison administrators . . . .  While we have an obligation to set a floor of constitutional[ly]

permissible conduct, we are ill-equipped to define the contours of life in jail."  *Kelsey v.*

*County of Schoharie*, 567 F.3d 54, 64 (2d Cir. 2009).

Here, the Kupec affidavit makes clear that legitimate penological interests are at stake. Briefly stated, 24-hour lighting allows correctional officers to verify that inmates are in the correct cells, are not engaging in prohibited activities, and that the walls and windows are intact; all without actually entering the inmates' cells. (Doc. 239-1 at 3-4.) Furthermore, low-level security lighting is preferable to flashlights for a number of reasons, including the fact that flashlights are more likely to disturb inmate sleep, increase the likelihood of the officer having to enter the cell, and alert the inmates to the officer's approach. *Id.*; *see King*, 371 F. Supp. 2d at 982.

Numerous courts have held that constant illumination of prison cells is justified by legitimate penological interests. *See, e.g., Chavarria*, 102 F. App'x at 436-37 ("policy of constant illumination [was] reasonably related to the legitimate penological interest of guard security"); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (continuous lighting in holding cell not unreasonable given security concern); *King*, 371 F. Supp. 2d at 985. Where those interests are not outweighed by the resulting harm, summary judgment may be appropriate. *King*, 371 F. Supp. 2d at 985.

The plaintiffs submit that a reasonable solution is the installation of lower watt bulbs in the range of 3 to 4 watts. (Doc. 266 at 8.) To bolster their claim that this solution would be "simple and effective," *id.* at 2, they cite the affidavit of prison security expert Walter Kautzky. As noted above, Kautzky's affidavit makes no reference to Vermont's prison facilities. Indeed, there is no indication that Kautzky knows the size or layout of Vermont's prison cells, or of any variations in cell dimensions from facility to facility. (Doc. 266-2 at 9) ("Document Review"). Furthermore, as the defendants

19

properly note, Kautzky does not confirm that lower wattage bulbs are available for the types of fixtures used in Vermont facilities.  (Doc. 269 at 7 n.4.).[2]  Because the plaintiffs lack adequate support for their claim that lower-wattage bulbs will resolve the constitutional question, the Court should not find that there is a question of fact with respect to the reasonableness of the current security lighting.[3]

Courts have made clear that legitimate penological interests need not be addressed through the least restrictive available means.  *See Rhodes,* 452 U.S. at 347; *Walker*, 593 F. Supp. 2d at 1146 ("the issue of which lighting method is least disruptive is beside the point.  Defendants are not required to use the method most liked by inmates, or the method judged best by the Court.  Rather, they are only required to use a method that does not unnecessarily and wantonly inflict pain.").  If alternatives exist, and those alternatives can be implemented at minimal cost to valid penological interests, the existence of such alternatives may be relevant to the question of whether a regulation is reasonable.  *See Turner*, 482 U.S. at 90.  Here, however, the evidence of such alternatives being viable is insufficient to create a genuine issue of fact.  Furthermore, there is little support for the plaintiffs' conclusion that decreasing wattages, at times by as little as a

---

[2]  According to the defendants, David McGee once requested a bulb lower than 5 watts, and was informed by the DOC Commissioner that a 5-watt bulb was the minimum wattage available for the fixtures used at that facility.  Id. at 8 n.7.

[3]  At oral argument, counsel for the plaintiffs suggested that if the case were to proceed to trial, Kautzky would review Vermont prison cells and supplement his conclusions.  The Court should not find that potential conclusions by an expert are sufficient to create a genuine issue of fact.  "Indeed, the very purpose of summary judgment - preserving resources for the adjudication of actual disputes - would be defeated if the non-movant, failing to meet its burden at the summary judgment stage, were given yet another opportunity to uncover and present facts at trial."  *U.S. Bancorp Oliver-Allen Technology Leasing v. Hall*, 2005 WL 1875459 (S.D.N.Y. Aug. 8, 2005); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

single watt per bulb, would transform an allegedly-unconstitutional practice into a constitutional one.   The defendants are therefore entitled to summary judgment on the plaintiffs' Eight Amendment claims.

## III.   State Law Claims

In addition to their Eighth Amendment claims, the plaintiffs allege that constant illumination in prison cells violates Chapter 1, Article 18 of the Vermont Constitution. When a federal court has jurisdiction over a case by means of a federal claim, it may exercise supplemental jurisdiction over related claims asserted under state law.  *See* 28 U.S.C. § 1367(a).  Once the federal claim is dismissed, however, it may decline to exercise jurisdiction over the state claim(s).  *Id.* at § 1367(c)(3).

In the course of exercising its discretion, a court must balance "judicial economy, convenience, fairness, and comity."  *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988); *see Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446-47 (2d Cir. 1998).  In *Cohill,* the Supreme Court stated that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." 484 U.S. at 350 n. 7; *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. . . .  [I]f the federal law claims are dismissed before trial . . . the state claims should be dismissed as well.").

The defendants urge the Court to dismiss the plaintiffs' state law claims on grounds of judicial economy and comity.  The plaintiffs have no objection to dismissal of their state law claims without prejudice.  (Doc. 264 at 2 n.1.)  Because issues arising under the Vermont Constitution should generally be determined by the state courts, and given the plaintiffs' consent to dismissal, I recommend that the state law claims be DISMISSED without prejudice.

## IV.    Renewed Motion for Summary Judgment

In addition to their motion for summary judgment on the merits, the defendants have moved to renew a previous motion for summary judgment based upon the plaintiffs' failure to set forth expert testimony.  (Doc. 251.)  Because the plaintiffs have since retained experts and submitted affidavits, and in light of my recommendation that this case be dismissed, I recommend that the renewed motion be DENIED as moot.

### <u>Conclusion</u>

For the reasons set forth above, I recommend that the defendants' motion for summary judgment (Doc. 238) be GRANTED, that the plaintiffs' Eighth Amendment claims be DISMISSED, and that their state law claims be DISMISSED without prejudice. I further recommend that the defendants' renewed motion for summary judgment (Doc. 251) be DENIED as moot.

Dated at Burlington, in the District of Vermont, this 3rd day of August, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(d).